Good morning, Your Honors, Counsel. My name is Judy Endian from Graham and Dunn. I represent the appellant, Dr. David Demers, who is here in court today. May it please the Court, with respect to time, I'd like to reserve three minutes for rebuttal. This is an appeal from a grant of summary judgment in defendant's favor. The standard of review is de novo. This case is not about a petty personality conflict instigated by a lazy, disgruntled professor, as the administration would have you believe. Rather, this case is about a professor with a deeply felt view that the First Amendment should protect a professor's speech. He didn't lose his First Amendment right to speak as a private citizen just because he's a professor. He shouldn't lose his First Amendment rights when he speaks as a professor, particularly with respect to his scholarly writings. Public university professors must have their academic speech protected under the First Amendment, or the consequences to the American education system are profound and quite negative. Well, that might be, but in this particular case, at the very conclusion of his opinion, the district judge said qualified immunity. So how is the law clearly established when, in Garcetti's case, the court specifically took that part of the argument out regarding faculty members? In other words, can you respond? And I know you have a very well prepared talk there, but can you respond to the qualified immunity argument? How is the law clearly established in this area regarding college professors? Well, Your Honor, the Ninth Circuit has addressed that issue recently in the Carl case. And in that case, the court said that a reasonable public official would have known that a public employee's speech on a matter of public concern is protected if the speech is not made pursuant to her official job duties, even if the testimony itself addresses matters of employment. And in this case, Your Honor, we submit that the seven-step plan was private speech. It was not public employee speech. Furthermore, Your Honor, I would point out that this is a journalism school. These are journalism professors at WSU, and it is in their very guidelines where they state academic freedom, freedom, responsibility, and discipline at ER 74. WSU states it has a long history of commitment to the principle of academic freedom for faculty and students. Freedom of expression is recognized as one of the essential elements of academic freedom. We submit in this case that the right is the First Amendment right to speak as a private citizen and also to speak as an academic. Let me follow up on Judge Quisp's question on qualified immunity. It seems to me one of the important questions in this case, maybe the centerpiece of the case, is whether or not Garcetti covers this, and if so, in what fashion. Some circuits, I'm thinking particularly of Adams, that's been very clear on the point, have said that that kind of savings clause in Garcetti should be understood to say, you know, academic speech simply is not covered by Garcetti, which then tumbles it back then, I guess, to Pickering. But we've never said anything on that question. So how can it be well established that Garcetti doesn't cover? Well, Your Honor, I would submit that based on other cases cited in the briefs, the Ninth Circuit has ruled that private employee, private speech, even if it's rendered by a public employee, is protected by the First Amendment. I got that. I understand. I mean, we're in the process of fighting through Garcetti in a whole lot of areas. We have an en banc call, for example, in a case called Dahlia. I mean, Garcetti is under active consideration in this circuit, shall I say. That's correct. And this court has not ruled expressly on the issue of whether the First Amendment protects academic speech, but I would point out that the university has conceded that the First Amendment protects academic speech. Well, let me ask it this way. Assume for a moment that there is qualified immunity for the university. How far does that extend? I understand qualified immunity protects the university, if it has it, against a damage judgment, or against the members, I should say, the university. We're talking about individuals. Does it protect them against injunction? No, Your Honor. And have you sought injunctive relief? We have, Your Honor. So the suit doesn't go away. No, we have sought a correction. What we contend are the erroneous statements in Dr. Demers' evaluations. So if we were to hold in your favor on whatever ground, and were to hold, nonetheless, that there's qualified immunity, the suit goes forward with respect to injunctive relief against the individual defendants. That's correct. You can disagree if you do. And, Your Honor, we would submit that the Fourth Circuit properly found in the Adams case that Garcetti was not intended to apply to academic speech. And, in fact, it's a situation that is more analogous to Dr. Demers' situation than the other circuit cases that have dealt with the issue of faculty speech. And I noticed in the Adams case that the Court of Appeals there held no qualified immunity. On the other hand, they already had a case on the books, Lee, when they decided Adams. Well, Your Honor, you also have several cases on the books, starting with the N case, et cetera, that lays out. But none of those cases address the academic exception to Garcetti if there is an exception. That's true. But this case can be resolved by looking at the seven-step plan as an example of private speech. Where it gets muddy, Your Honor, is that the district court lumped the seven-step plan into, quote, the official duties of Dr. Demers as a university professor. I have trouble, I have to say, speaking only for myself, treating that seven-step plan as cleanly private speech. I understand that Dr. Demers sets it up that way. On the other hand, it originates when he's a member of a committee. It's clearly undertaken in tight relationship to his job and the things that he cares about in his job. He's suggesting an important restructuring of two departments. I mean, I have trouble seeing that as purely private speech. Your Honor, might I address that? Please, yes. Well, first of all, Your Honor, the question of whether it is part of his job duties, as this court has said in at least five cases, is a mixed question of fact and law that should be reserved for the trier fact. In this case, the district court basically accepted all the evidence that the university put forth and did not consider the evidence that Dr. Demers put forth on that point that showed the following. First of all, the seven-step plan, as one component, recommended a splitting of the Mass Comm and Comm Studies. The rest of it, the rest of it is not covered anywhere by any connection with his work in connection with the structure committee. You know, I disagree with that. The seven-step plan, and I'm not going to talk about whether I agree with it or disagree with it, I will simply say that it's a thoughtful proposition for restructuring how journalism is taught, how the faculty is organized, how money is raised. I mean, all of that has to do with the running of the institution in a very important way. Your Honor, there are several distinguishing facts here. First of all, Dr. Demers made it clear that, yes, he is a professor, but he also owns a publishing business, and he has very definite opinions based upon his career as a journalist, as a publisher, as a professor about how the journalism school could be improved. He was concerned about the deterioration of the relationship between the professional media community and basically the Ph.D.-driven community. That's exactly what that plan says. And he explains that. It's a form of intellectual output. But I think what counter-distinguishes this most importantly from, quote, job duties, is he put his money where his mouth was. He put a significant pledge of his private resources to the university to say, this is what I believe. I believe this. There is no way that that could be construed as part of an official job duty, to make a commitment of your personal finance. Looking at what it says in the letter to Provost Bates, it says the purpose of this plan is to show how Washington State University can turn the Murrow School of Communication into a revenue-generating center for the university and at the same time improve the quality of the program itself. And it goes on. So it's focused on WSU. It's focused on the academy of which he is an employee. Now, he also has this other position. You say it's a tribal issue of fact, and it's a mixed question of law and fact. The individuals, at least, if we're still talking about qualified immunity, are you saying it would be clear to anyone that this was purely private speech and not something that would be subject to the Garcetti analysis? Well, Your Honor, there are so many facts that distinguish this from, like, public employee duties. Well, that may be, but I'm asking you, is it clear to someone that it would be purely private speech under Garcetti? Isn't that the issue for qualified immunity? I think it would be clear that this is a statement that this person is willing to put $50,000 to the university as a pledge to promote his vision of what the university. That doesn't mean that it doesn't have an element of working out of his position as a member of the faculty. Well, that therein, I think, lies the heart of the problem here, which is, you know, how do you define, quote, the official duties of a professor, and when can he wear a hat as a citizen? Well, it works both ways. I'm not trying to justify whatever was done. I'm trying to talk about qualified immunity, how in this landscape with Garcetti. I was on the Garcetti panel. It got reversed. We thought it was clearly, you know, under our law. It was clearly outside the normal duties. The Supreme Court said no. And then it said, because Justice Souter saw implications for the academy, said, okay, maybe there's a way to distinguish the duties in an academy. But if you're sitting in the academy on both sides, Professor Demmer and the administration, are you saying it's so clear that this seven-point plan is totally divorced from his role and duties as a member of the academy? He was on the committee, wasn't he? He was on a structured committee that looked at separating the Murrow School from the College of Liberal Arts and creating its own college. That's what the task was. They were not tasked with looking at any of the other aspects covered by the seven-step plan. And his work on the committee was minimal. There is evidence in the record that establishes that no one told him to write the seven-step plan. As a matter of fact, his superior didn't even know about it. Let me take another cut. Your time is running, so pardon me for interrupting. What if I were to conclude that there's an academic exception to Garcetti, both as to the book, which at the time of the behavior complained of, is still in prospect but has been described with enough detail that maybe that's the basis for the alleged allegation, but also that I would also say that there's an academic exception for important structural revisions of the academy and that Garcetti doesn't cover either one of these things. Then what? So even if it's done as part of his duties as an academic, the seven-step plan doesn't come under Garcetti. Then what? Are you asking what standard to apply in evaluating it? What's the next step? Well, then the next step would be, I guess, to follow the Adams court, which is to apply the Pickering balance test. And then the question is, and this is part of the question in Garcetti, but now it shows up in a different way. Okay, where's the public interest in this? The public interest is in preserving academic freedom, which we believe is jeopardized by narrowly applying Garcetti. Where's the public interest in what he is saying? That is to say, the district court says there's no public interest here in terms of the seven-step plan. This is just restructure of the department. Okay, so you're talking about really an issue of public concern. That's right. We need that to get going not just with Garcetti, but we also need it to get going under Pickering. Public concern, I would submit, and there's plenty of discussion in the briefs on this, that the quality of journalism education in America and specifically in Washington State at WSU, which is the only full journalism program, is a matter of public concern. There are multiple cases cited in the briefs where they talk about quality of education is a matter of public concern. The fact that there's a deteriorating relationship that may be harming the school is a matter of public concern. It's a huge school over at WSU. It's going to produce future journalists, and how they are taught, what they're going forward to say, I would submit is prima facie a matter of public concern. We just finished an election in which the public relied heavily upon news reports. You can say that about all education, but your argument then is that it would be a matter of public concern as to what the specific curriculum would be at Washington State University. Is that correct?  I don't like this curriculum. I think you ought to teach this, you ought to teach that. I mean, isn't that something that's really in the academic area? You can have free speech within that, but is it a matter of public concern? Well, Your Honor, if I might address it this way. I mean, we want good doctors, too. Right, well, and there is a case cited from Idaho in the brief where the court held there that the issue of establishing a separate medical school was a matter of public concern. But I think that what you're going for is if you look at the seven-step plan, it really is more a vision and identification of a problem. It's not getting down to the granular levels of I don't like this class or that class. It's saying, wait a minute, there's a problem here because the professional community is being alienated by the professors at WSU. Let's fix that. I share Judge Quist's concern about line drawing. I understand the arguments as to why a journalism school is important, why the structuring of a journalism school is important. But this importance of things going on in education, boy, there is a long, long line. I don't know whether to call it a slope or a line. Let's imagine we're having a fight in the English department. Do we emphasize modern literature? Do we emphasize pre-Shakespearean literature? Should the novels of Thomas Hardy be split off from the poetry of Thomas Hardy? I mean, where are you going to stop for us? Well, Your Honor, I think that's why courts are particularly well-suited to help draw that line. To decide about an English curriculum? Well, no, Your Honor. I think that there are cases where, you know, the court said, and I could provide the precise site, where one case where a court said what the teaching of a particular book in a high school curriculum, I think it was Huckleberry Finn, was a matter of public concern. So I do think that when it comes to education. Yeah, that's a debate that gets out there because of racial discrimination and the sensitivity of blacks to the use of the N-word in the text. And, you know, that's a well-known public controversy. Well, Your Honor, this circuit has. I'm not sure you can elevate Thomas Hardy and splitting the poetry from the prose in the same category. Well, Your Honor, I would submit that this circuit has defined issue of public concern quite broadly and has said that it's multifaceted. And it goes beyond matters identified by the district court as just exposure of corruption and abuse of public funds. You're over time. But I would just make an observation that we're very familiar with this part of the law. But, again, coming back to Garcetti, that was also, you know, the matter of public interest was a driver, a major driver in the panel opinion. And so both content and public concern bled into the restriction that the Supreme Court imposed on the officer in that case because they said, well, it's all very nice, but it's part of his duties. Even though, you know, faulty police work and improper testimony in court seemed to us quite clearly a matter of public concern. So Garcetti makes it pretty difficult. Garcetti is a complicated case. Is there a question, Your Honor, that you'd like answered? Just an observation. Thank you, Your Honor. May I have like a minute to respond? We have taken you over. We will make sure you have a chance to say what you need to say in rebuttal. Thank you, Your Honor. Good morning. May it please the Court, Counsel, I'm Catherine Baciuello. I represent Washington State University. Now, just to be clear, is this a suit against the university or is this a suit against individuals? I represent the individual defendants who were the faculty members, the administrators at Washington State University who were involved in. So the university is not a defendant. The university is not a defendant. Thank you, Your Honor. The central issue, the deciding issue in this case is whether Dr. Demers' speech addresses a matter of public concern. And I propose to focus my argument on why he has failed to meet this threshold burden. Could you address first whether we should recognize an academic exception to Garcetti? Well, the Court has not heretofore recognized the academic exception. And I would like to talk a little bit. I do not think the Court needs to recognize an exception or answer the question that was raised in Garcetti to decide this case, and indeed would submit that the facts of this case do not invite the Court to answer that question. I might want to answer the question, so you might want to address the question at some point. You don't have to address it first, but I'd like you to address it at some point. The carve-out, if you will, in the Garcetti case focused not on all faculty conduct and all faculty speech. The concern that Justice Souter raised and that the majority focused on, in their opinion, was faculty scholarship and faculty classroom instruction. That's right. All right? And it said we're not addressing that. And we're not addressing that. Said it pretty quickly. Said it pretty quickly. This case, I submit to the Court, does not present an issue about faculty instruction. No one is arguing that the seven-step plan is classroom speech, materials that Dr. Demers is proposing to use in his curriculum. And really, we don't know the extent to which it is scholarship because the content, we don't know the extent to which the ivory tower of Babel is scholarship because the book is not before the Court. Excerpts of the book are not before the Court. What is before the Court is a roughly seven-year history of varying descriptions by Dr. Demers of his work in progress. And those descriptions vary in how they describe the content of what the book may be when it's finished and how they describe the tone of the book. But there is no scholarship before them. It's a very different case than the Adams case. And when Adams was looked at, I don't want to. It's interesting that they're not different in the sense of the name of the book in the Adams case. They are exactly the same. And so one wonders if Dr. Demers hadn't read that book in 2004 when it was published. Or maybe he wrote it with that title thinking, hey, it worked in Adams. Maybe he did. But in Adams, the Circuit Court of Appeals was very careful to distinguish and to say there may be cases of faculty expression that don't involve classroom teaching and don't involve scholarship. That's not this case. Let me push on that one a little bit. I understand that the carve-out, if that's the right word for it, in Garcetti, is limited to scholarship and classroom teaching. I'm wondering whether the question is actually a little broader than that. And it's hard to know because the Court is so quick. But there are lots of things having to do with the quality of education provided that aren't sort of tightly confined to either works of scholarship or actual classroom teaching. For example, structuring of departments. How are we to structure the system by which we deliver our classroom teaching? And if it's that broad, the seven-step plan might come in under that. If it is that broad. If it is that broad, perhaps it could. And then we would go, if we follow this Court's jurisprudence in which this Court has said prior to Garcetti, the Pickering test is what we apply to First Amendment cases involving First Amendment speech, we still get back to that central question of matter of public concern. And there's two speech acts that are remaining before the Court in this appeal, and it is the seven-step plan and the book. Or the ivory tower of Babel, the descriptions. What we know about the book. What we know about the book. And as this Court has stated, the burden is on the plaintiff to prove that the speech addresses a matter of public concern, and it's the Court's characterization that is dispositive, not the plaintiff's. It's the Court's characterization after looking at the entire record, focusing initially and foremost on content, but then moving into form and context, that is the deciding factor on whether the speech is a matter of public concern. And counsel for the appellant is correct when she says that the general description is a broad one, and yet we know from... Are you on seven steps or are you on Babel? Well, I'm kind of generally focusing on how we get to what we look to to help guide the inquiry. I thought you were zeroing in on one of the works. No, I was zeroing in on counsel's remark that what is a matter of public concern is very broad, and we can take the seven-step plan, Your Honor, as our point of focus. It cannot be that every speech is a matter of public concern. The test isn't that broad. The Court has described boundaries, and how do we find those boundaries? We look at the Court's opinions, and I think the 1995 Lambert opinion and the de Rocher's opinion and the Ng opinion give us a good description of the types of conduct that raise matters of public concern or the types of expression, and those expressions involve complaints or concerns that would cause the public to question whether the government officials are conducting their duties in a legal way, in an efficient way, in a way that doesn't threaten the public purse, in a way that does not involve a breach of trust. So let's look at the content of the seven-step plan. It essentially boils down to three suggestions on how to structure a program. We should separate comm studies and mass comm faculty. We should encourage more involvement of the professions, and we should seek accreditation. I believe this is a matter of public concern, says Dr. Demers. Let's look at the literature, at the blogs, at the material he provides to the Court. This debate has been going on among faculties that have journalism and communication programs at schools around the country. There's no right or wrong way to answer those questions. It's not a matter of discussion. But the fact of the debate going on suggests maybe it's important. Well, it is very important to academics, very important. Is it important outside the academic community? I would know, Your Honor. I see no evidence in the record. Journalism schools don't matter much to the outside community? I mean, that's a point of view. The public does not have a vote, as Your Honors pointed out in some of the questions earlier. The university decides. They do in California. We just passed Prop 30 yesterday because of higher education and elementary education, and public does decide how its taxpayer dollars get spent. And, in fact, one of the big arguments against Prop 30 was, are we sure this is going to be wisely spent on education or whatever? And so if you are saying that journalism school structure is a matter of academic debate around the country, that's a pretty large public right there. Does it have to be ñ are you suggesting that's all within the academy and that this debate doesn't spill over into funding of public journalism schools? Your Honor, I would submit there's a distinction between the public's input into public and secondary schools and public input into matters of curriculum and program structure at the university level. That distinction was called ñ was highlighted in the Johnson v. Ponaway School District case where the court said the Garcetti academic exception, whatever it means, does not apply to primary and secondary schools. But in the university setting where there is a ñ excuse me. Well, yes, because that's a different category, primary and secondary. But Prop 30 that I'm talking about, that's what you're referring. That applies to the University of California. So I guess I'm not sure of what your point is. Let's compare that with the seven-step plan. The seven-step plan is not suggesting to the public that Washington State University is not appropriately managing its program, that it is mismanaging or misapplying or misusing funds. Well, it depends on what you mean. Obviously he's not accusing the university of stealing money. We're not talking financial malfeasance. But it's very clear that he thinks it's managed in a way that it shouldn't be managed, and he has an important suggestion for improvement. Now, people disagree with the suggestion, but you could call it a suggestion for how you manage it. How do you divide it up? Well, and then because if there is some basis for suggesting at least a marginal relationship to matters of public concern in terms of content, we have to go on to the other two components that the court looks at in deciding whether the court will characterize the speech as addressing a matter of concern, a public concern, and we look at the form of the speech and the context, guided, again, focusing on the Lambert opinion, by this critical inquiry, whether the employee spoke in order to bring wrongdoing to light or merely to further some private interest. And so what is the form? You can read that case as exhaustive. I do not. Not as exhaustive. That is to say I don't think the only matters of public concern are affirmative wrongdoing. No, but we are focusing on the motive, and what is the motive of the speaker? That's the critical inquiry. Is he motivated by a desire to address a matter of public concern or is he motivated primarily by a desire to further a private interest? And here, what is the form of the speech? The form of the speech is a letter to his provost and to his president within the university outlining his view of how an internal debate among his faculty that he characterizes in his deposition as quite controversial and quite a power struggle, how that debate should be resolved. And he says, if you go back to the faculty or if you, university, adopt my view, I'll give you money. This is about having the power struggle and the structure of this university, of this program, have that debate resolved in a way that benefits me. And I'm putting my money where my mouth is because that's in my personal interest. You could say giving money is altruism. I didn't see in his letters, I'll give you money if you name the school after me. No. He didn't say that. He didn't say that. The other, we also need to look at the context in addition to the form. One more thing about the form, Your Honors, is that Dr. Demers agreed in his deposition and the content. This is not newsworthy. This isn't something that is of interest to the public. This is not a newsworthy topic. I didn't expect it to get press. It is really an internal faculty issue. I read that language. As I read it, that was directed as to whether or not the newspapers were going to pick it up. There's an awful lot of very important stuff that the newspapers are very reluctant to report. And typically I would submit that when we go back through the cases where they have said that the fact that it's a very small audience is not dispositive of whether it's a matter of public concern. But there we're really talking about civil rights violations and illegal conduct as opposed to one faculty member's viewpoint on how an internal debate within the university about the structure of a program should be resolved. Can I ask you a question? Yes. I'm looking at the exhibit of the seven-point plan on the page that says prepared by Marquette Books. There's a picture of a building. Is that a WSU building? I am not going to swear under oath that it is. But if you don't know, I'm just curious what the building is. Can I ask you the following? The picture on the first page is a WSU building. Excuse me. That one. Yes, this is a WSU building on the first page. Right now I'm referring to ER 698. Let me ask you this. It was a question on qualified immunity. Qualified immunity clearly applies to damage judgments against individual officers. Does it apply to injunctions? No, it doesn't. So if we were to find qualified immunity, the injunctive part of the lawsuit could go forward? I am troubled by that proposition because of the injunction. Well, I'm asking you a question of law. Does qualified immunity protect an individual against an injunction? The injunctive relief would be directed, if it were awarded, would be directed to the university and to the individuals. No, the university is not a defendant in this case. To the individuals. Yes. Yes. So just to make sure I understood your answer, assuming that there is qualified immunity for these defendants, does that immunity extend to injunctive relief against these defendants? No. Okay, got it. I thought that was the answer you would give, but I want to make sure we have it on the record. Yes. So I believe I was talking about the contextual factors. I think we've talked about the manner in which it was submitted. We've talked about the fact that the plan evolved out of an intramural dispute over the direction of the structure of this program. And finally, I think we need to look at the timing of the decision to submit the plan outside the university and what was going on with Dr. Demers at that time. He was well aware that as a result of a very transparent process of discussion between a new unit head and its faculty, a decision had been made to enhance accountability measures, if you will, and demand more in terms of or more carefully scrutinize academic performance in a number of ways. And then go to the retaliation. Okay, we got it. Thank you. Thank you. We've taken both of you over. Would you like two minutes? Thank you, Your Honor. I very much appreciate that. I'd just like to briefly respond to the claim that the ivory tower battle is not considered a scholarly work. The record is pretty clear that it's consistently described as an examination of where the social sciences have failed in connection with American education. I didn't hear a claim that it was not a scholarly work. It might have been a claim that we don't have the book in front of us in this record, which is true. Right, which is true, but as we point out in the brief, we do not believe it is essential. The university conceded during oral arguments that the First Amendment protects works such as the Tower of Babel. And she said it, counsel said it, S.E.R. 571, it's not speech arising from his scholarship. It's not speech arising from his research, referring to the seven-step plan. Those areas of speech are entitled to special First Amendment protection. So I just would like to remove off the table the issue of whether the ivory tower of Babel is a scholarly work subject to that protection. I'd also briefly like to address the fact that she, counsel discussed. Can I just ask why the excerpts that were, in fact, given to the faculty weren't part of the record? Your Honor, I believe that at the time Dr. Demers and I viewed the description of it as it was contained in his application to go on sabbatical would be sufficient to describe the topic. That doesn't say what the content is. It's just a proposal. What are the excerpts that the defendants acted on? The excerpts that the defendants acted on are referenced in the deposition testimony that they have read them. But, Your Honor, the excerpts are not in the record. And that's the basis on which the district court faulted your burden of proof. Isn't that correct? Well, that was one aspect of it. But he did rule that the book was nonetheless not protected because it was part of Dr. Demers' official duties. So it's kind of a skewed half ruling in that respect. And counsel, the defendants never raised that issue at all before the district court. And so we submit it's abandoned on appeal. But to sum up, Your Honor, if you do look at the context and the content and the form, the seven-step plan was a product of actually altruism in the sense of Dr. Demers felt very strongly that the direction of the Murrow School had gone off the rails. Altruism is often deeply self-interested. Well, but there's nothing in the record that shows that he was going to gain anything from this. Got it. And he went outside of his school. And that is an important indicia of basically trying to be heard. Whether it's newsworthy is not the test for whether it's a matter of public concern. He did submit and had it publicized with news releases. And, Your Honor, I get that symbol, and I will conclude. Thank you very much. Thank you. Thank both sides for your arguments. Yes, thank you. The case of Demers v. Austin now submitted for decision.
judges: Quist, Fletcher, Fisher